651 A.2d 1084

ALBERT T. BAUER, TRUSTEE OF THE HENRY D. MOORE MAU-
SOLEUM TRUST, AND ALBERT T. BAUER, INDIVIDUALLY,
PLAINTIFFS, v. HARLEIGH CEMETERY COMPANY, DEFEN-
DANT.

Superior Court of New Jersey
Law Division Camden County

Decided March 23, 1994.

*Gino J. Benedetti* for plaintiffs (*Flaster, Greenberg, Mann & Wallenstein,* attorneys).

*James A. Mullen, Jr.* for defendant (*Montano, Summers, Mullen, Manuel, Owens & Gregorio,* attorneys).

## OPINION

GREENE, J.S.C.

This opinion is a refinement of the court's earlier orally recorded opinion granting defendant Cemetery's *R.* 4:40 motion for judgment at the conclusion of all the evidence and determining that a nonprofit Title 8A cemetery is not liable for damages to individual mausoleums or grave sites caused by vandals.

The complaint primarily charged the defendant cemetery with negligence resulting in physical damage to certain burial sites, caused by unknown vandals, criminals or trespassers.

It is conceded that the burial plot in question, consisting of a private family mausoleum and approximately twenty below ground burial sites, marked by grave stones, bearing bronze plaques, had been damaged by unknown parties. The mausoleum on one occasion had been broken into and a number of the bronze plaques had been removed from the grave stones. Plaintiffs claimed a duty owed to them by the cemetery to take precautions and protect the sites from violation by third parties.

The evidence establishes that the cemetery, a nonprofit corporation under *N.J.S.A.* 8A:1–1, consists of approximately 110 acres,

situated in the City and County of Camden. It is not bounded by any residential property; its boundaries are the Cooper River, New Jersey State Highway Route 130 (four lane), Haddon Avenue and Vesper Boulevard. On the other side of Vesper is Our Lady of Lourdes Hospital; perhaps at the extreme northerly end of Vesper are a few row houses across from the Cemetery.

There are 40,000 burials in the cemetery and it is open daily from 7:30 A.M. to 4:30 P.M. The great majority of the burials are underground. There are, however, mausoleums, public and private and niches. The cemetery is bounded by a metal spike fence five feet in height. During the daytime, Camden City police will occasionally ride through the cemetery as part of routine patrolling.

In addition to the testimony relative to the use of the cemetery for burial sites, it was established that, in the daytime, use of the cemetery was made by hospital personnel on break and residents of Camden, fishing some ponds and occasional picnicking. It is in this environment, inferentially at night, that the damage or loss occurred, and for which plaintiffs seek to hold the cemetery responsible.

■ This is a case of first impression in this State. *Coleman v. St. Michael's Protestant Episcopal Church,* 170 *A.D.* 658, 155 *N.Y.Supp.* 1036 (App.Div.1915), held that there was neither a contractual, statutory nor implied duty on a cemetery to protect against theft of bodies by third parties. The only rationale was that to do so would cast an unreasonable burden on the cemetery, compared to what was paid for the grave, which rationale was stated without further elaboration.

■ New Jersey law does permit findings of negligence against cemeteries but based upon direct negligent maintenance of the cemetery or *respondeat superior, i.e.* the tortious conduct of employees. See *Lawlor v. Cloverleaf Memorial Park, Inc.,* 56 *N.J.* 326, 335, 266 *A.*2d 569 (1970).

■ New Jersey law will generally permit liability for criminal acts of third parties to be placed upon others predicated upon certain concepts of foreseeability but those impositions are also subject to public policy and to concepts of fairness. *Goldberg v. Housing Auth. of Newark,* 38 *N.J.* 578, 186 *A.*2d 291 (1962) is frequently cited for those factors that must be considered in determining the existence of duty and expanding liability. *e.g.* See *Caputzal v. The Lindsay Co.,* 48 *N.J.* 69, 75, 222 *A.*2d 513 (1966); *Frame v. Kothari,* concurring opinion 115 *N.J.* 638, 651, 560 *A.*2d 675 (1989); *Contey v. N.J. Bell Telephone,* 136 *N.J.* 582, 643 *A.*2d 1005 (1994). A "premises liability" case, *Goldberg* states, relative to the duty of a private party to provide protection for another:

> The question is not simply whether a criminal event is foreseeable, but whether a duty exists to take measures to guard against it. Whether a duty exists is ultimately a question of fairness. The inquiry involves a weighing of the relationship of the parties, the nature of the risk, and the public interest in the proposed solution.
>
> [*Goldberg v. Housing Auth. of Newark, supra* 38 *N.J.* at 583, 186 *A.*2d 291 (1962) ]

The application of *Goldberg* to the facts of this case is what impels the determination that the cemetery did not owe plaintiff any duty to protect or secure their burial sites.

## I.

The relationship between the parties is essentially family lot owners and their interest in the interment of relatives within the cemetery. The plaintiffs are recognized by the cemetery as the owners of the plot and the court accepts that, though the record is not clear. Between these parties there exists no contractual obligation to protect the burial site. The cemetery is a nonprofit corporation, engaged, as Harleigh Cemetery, in the operation of a cemetery under the authority of the New Jersey Cemetery Act (*N.J.S.A.* 8A:1–1) and in accordance with a certificate of authority granted to it by the New Jersey Cemetery Board. *N.J.S.A.* 8A:3–9, 13. As noted, it contains approximately 40,000 burials, the great majority "in ground" graves; some entombed in mausoleums, private or public, or in niches (*N.J.S.A.* 8A:1–2). Being a

nonprofit corporation, there is neither money of the corporation available for dividends to be distributed to any shareholder nor is the real estate subject to local real estate taxation. (*N.J.S.A.* 8A:5–10)

The record reflects no reason why lot owners, with the permission of the cemetery not to be unreasonably withheld, may not install, particularly within a mausoleum, security devices to sound or give alarm in a protective effort. Such efforts most likely would be considered a "maintenance" right statutorily granted owners in *N.J.S.A.* 8A:7–3.1.

It is the lot owner who chooses a memorial in the form of a mausoleum. The design, including the ability to see the interior from the outside, the lock or security measures and building materials, all may well raise in the minds of thieves or delinquents that unusual loot or booty is within. It is the owner of the mausoleum that creates the attraction.

All of the foregoing indicates that control of the conditions, as the site is relatively "open", is more in the burial site owner, by contract or individual security effort, than in the nonprofit cemetery.

## II.

The nature of the risk is that a parcel of real estate, 110 acres, fenced to a height of five feet, with elements of use by members of the general public in the day time, scattered mausoleums, statues, and grave sites behind which to hide, is easily penetrable by trespassers and subject to thievery, particularly at night. The property is not bounded to any extent by residential properties from which the cemetery may receive an incidental security benefit. The nature of the risk, from a value perspective, whether mausoleum or bronze plaques, is that which the owner controls. It is bounded by a major four lane highway, commercial Haddon Avenue and Vesper Boulevard and the Cooper River.

None of the testimony disclosed any standard of practice for cemetery security. Open cemetery lands at night do not present difficulty in dodging any night patrol. It is difficult to say that the premises of a cemetery are exclusively within its control twenty-four hours a day. The nature of this risk is analogous to the risk a farmer has of nightly seasonal incursions into fields by passing motorists to pick peaches or corn.

## III.

The remaining item for the scale in this *Goldberg* weighing process is the public interest, a calculation of the burden, and upon whom it would be imposed if the cemetery is determined to be liable for damages to burial sites by reason of third party action. Cemeteries constitute special real estate.

> "Cemeteries, however, since they facilitate the proper and necessary disposition of human remains—a subject matter charged with public welfare and health—are accorded tax exemptions."
>
> [*Locustwood Cem. Ass'n. v. Cherry Hill Tp.*, 133 *N.J.Super.* 92, 96, 335 *A* 2d 571 (App.Div.1975) and *N.J.S.A.* 8A:5–10]

To assure continuance of maintenance and preservation of such facilities, a special irrevocable statutory trust must be maintained, which trust is called Maintenance and Preservation Fund. (*N.J.S.A.* 8A:4–2). This fund is supervised in its perpetuity and operation by the New Jersey Cemetery Board (*N.J.S.A.* 8A:4–2). The purpose of the trust is continuous maintenance and preservation of the cemetery.

The lands, premises and properties of cemeteries are so statutorily sacrosanct that even a civil judgment, arising out of an ordinary negligence case, may not be satisfied through the normal procedures of levy and execution. The cemetery law shields cemetery property of any nature from sale on execution. (*N.J.S.A.* 8A:5–10) and a judgment creditor must seek judicial sequestration of cemetery income (*N.J.S.A.* 8A:5–13).

Additionally, the burden and available finances are what a jury would be seeking to resolve in deliberations concerning a ceme-

tery's effort or breach of duty relative to providing protection. Under the impediments of open space and limited funds what can be expected of a jury's deliberation as to whether any precautionary or protective steps taken by a cemetery were reasonable? The jury would be engaged in substituting its judgment for that of the cemetery board of directors, who operate in a limited financial environment. This problem, dependent upon its magnitude, should be considered and addressed by the State's Cemetery Board and the Legislature.

Understanding the Legislature's "guardianship" of cemeteries' land and income, arising out of the special cemetery purpose, further expansion of cemetery liability for acts of third party vandals or criminals would be contrary to that public interest. If appropriate, the Legislature or the Cemetery Board make such changes in this area as are deemed desirable.

Another aspect of the public interest is that though the high percentage of burials is "in ground", all burials would be bearing an expense of a risk generated by those few "burials" which reflect something of marketable value, either mausoleums or those stones not engraved but embossed with brass plaque.

Finally, the Attorney General's application to appear as amicus curia in the proceedings for the purpose of filing a letter brief, opposed by plaintiff, was granted by the Presiding Judge. When filed, plaintiff contested the relevancy of the brief, particularly in an action between private parties.

Since cemeteries, one and all, are affected by the public interest, I find the letter to be relevant of these proceedings and a part of the evidential record (*N.J.R.E.* 101(a)(4)). The Attorney General stated:

> Cemeteries throughout this State are already facing serious financial problems due to the shortage of land for interments and the inability to make payments into the M & P Fund, the income of which will adequately cover rising maintenance costs. Available land is inextricably related to the amount of money a cemetery can afford for maintenance and preservation of its grounds. To subject a cemetery to liability for the acts of vandals or trespassers is to impose additional financial strain on an industry that is already suffering from depleted funds. Because

available cemetery lands are rapidly diminishing, the prognosis for increased funds for maintenance is unfavorable.

## IV.

Thus, the court concludes that defendant cemetery is without any duty to plaintiff for damages caused by the actions of third party vandals or criminals.

In its oral grant of defendant's motion for judgment the court discussed further plaintiffs' additional theories of liability, namely breach of contract, breach of warranty and negligent infliction of emotional distress. Applying the standard set forth in *R*. 4:40, the Court granted judgment in defendant's favor on these claims because of lack of evidence and as required by law.